## Lockhart *et al. versus* Bonsall *et al.*

77    53
128   268

1. Bonsall bought from the plaintiffs *for his firm* 5000 barrels of oil, to be delivered at buyer's option before December 31st, on ten days' notice, in "bulk cars or bulk boats at Pittsburg;" if delivered by A. V. or W. P. Railroad, buyer might designate any other point on those roads ; payment to be made as lots were gauged and delivered. He bought also *for himself* from plaintiffs 5000 barrels on precisely the same terms. On the 21st of December Bonsall gave plaintiffs two notices in the same terms to deliver the respective lots of oil, at such point or landing as he might designate, &c. The plaintiffs shipped all the oil to Pittsburg on 30th of December, had it inspected and gauged, and on 31st told Bonsall they would give him the numbers of the cars that he might examine ; he made no reply, but shortly afterwards, on the same day, gave plaintiffs notice to deliver at the Anchor works

[Lockhart *v.* Bonsall.]

on A. V. Railroad; plaintiffs directed the oil to be delivered there, there not being room for all on that siding, the nearest sidings were filled, ready to put on Anchor siding as the others were emptied; they tendered to Bonsall 5981 barrels in bulk, the extra 981 to be on his own contract. He refused to receive, giving no reason. *Held,* that it was for the jury whether the tender was sufficient.

2. It was Bonsall's duty to give reasonable notice of the place of delivery and to be there ready to receive and pay for the oil.

3. The Anchor siding not having room to hold the cars, it was sufficient if the plaintiffs put the oil on the nearest sidings ready to be moved on the Anchor siding as it was emptied.

4. The sufficiency of the tender is to be determined by all the facts and circumstances connected with it and the motives of the parties.

5. Bonsall was not bound to accept more or less than his contract, but if there was a larger quantity, from which he might separate the 5000 barrels, it not being plaintiffs' engagement to pump the oil from the cars, it was sufficient.

8. If the plaintiffs offered in good faith to deliver the oil, they were not bound to set apart the precise quantity named in the contract before offering to deliver.

9. Stevenson *v.* Burgin, 13 Wright 36, distinguished.

October 20th 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the Court of Common Pleas of *Venango county:* Of October and November Term 1873, No. 69.

This was an action of assumpsit, brought March 20th 1871, by Charles Lockhart and William Frew, trading as Lockhart & Frew, against Sterling Bonsall, Thomas M. King and H. C. Fletcher, trading as Bonsall, King & Co.

The plaintiffs declared for the refusal by the defendants to receive and pay for 5000 barrels of oil, which they had purchased from plaintiffs by the following contract.

"Pittsburg, April 27th 1870. Bought of Messrs. Lockhart & Frew, per account of Messrs. Bonsall, King & Co., five thousand barrels good, green, merchantable crude petroleum, forty gallons. to the barrel, gravity, forty to forty-six degrees, at a temperature of 60° Fahrenheit, to be delivered at buyers' option, at any time on or before thirty-first day of December 1870, buyers giving ten days previous notice to sellers, in bulk cars or bulk boats, at Pittsburg. If delivered by Allegheny Valley or Western Pennsylvania Railroads, the buyer may designate any other point of delivery on line of said roads. If delivered by water, then at any good landing in or near Pittsburg buyer may direct. . Payment to be made cash on delivery, at the rate of fourteen and one quarter cents per gallon, on lots as gauged and delivered.

JOS. P. WOOD, broker."

"Accepted—BONSALL, KING & Co."

On the 26th of April 1870, Sterling Bonsall, for himself alone, and plaintiffs, had made a similar contract for the delivery of 5000 barrels of oil.

[Lockhart *v.* Bonsall.]

On the 21st of December 1870, Bonsall served on the plaintiffs two notices for the delivery of the oil, precisely alike except stating the contracts by their respective dates.

The notices were as follows:—

"Pittsburg, Pa., December 21st 1870.

Please take notice, that I hereby call for the delivery, by you, to me, at such point as I may designate, near or at Pittsburg, Pa., of five thousand barrels of good, green, merchantable crude petroleum, forty gallons to the barrel, gravity, forty to forty-six degrees, at a temperature of 60° Fahrenheit, either in bulk cars or bulk boats, at Pittsburg. If delivered by A. V. R. R. or W. P. R. R., at such a point as I may designate on the line of said roads. If delivered by bulk boats, at such landing as I may designate on the Allegheny river; in accordance with the terms of a certain contract signed by you, April 27th 1870. My option is to receive this oil on the 31st day of December 1870.

STERLING BONSALL.

To Messrs. LOCKHART & FREW, Pittsburg."

The cause was tried November 14th 1872, before Trunkey, P. J. The plaintiffs gave in evidence the contract and the notices.

Frew, one of plaintiffs, testified: "On the 21st of December, or next day, I called on Bonsall, or Gallagher, his agent, to get the place for delivery; Gallagher was his agent, but could tell us no place; we immediately ordered the oil to be shipped to Pittsburg; commenced receiving the next week; we had over 10,000 barrels of oil in Pittsburg, and placed as near the outer depot of the Allegheny Valley Railroad as we could get it; all on cars—some at "Holmes," "Sharpsburg," "Brilliant" and "Standard" sidings; we had the oil all regularly gauged and inspected by the regular officers; we had the gaugers go over the entire quantity on the 31st of December, and for that reason were late in the day in delivering our certificates; I obtained a sufficient number of certificates of gauger and inspector, and tendered them to Mr. Bonsall and his brother, on December 31st, between 4 and 5 P. M.; I tendered 5000 barrels on contract of Bonsall, King & Co., and a surplus of 981 barrels, tendered on a contract of different date, with Bonsall, which matured on same date; I presented the entire 5000 barrels at one time; Sterling and Charles T. Bonsall were present; spent some time looking over the papers, and declined to accept the oil, and gave no reason for declination; a short time after, I made another tender on the other contract, and then handed them a receipt from the A. V. Railroad for the whole amount due on both contracts, and the surplus; about 10 A. M. on December 31st, was the first time Bonsall gave us notice where to deliver the oil; verbal notice to deliver at the Anchor Oil Works; we gave notice to the A. V. Railroad to deliver the entire

[Lockhart *v.* Bonsall.]

amount of both contracts to the Anchor works, or as near to it as they could possibly get it; I then obtained a certificate from the railroad, that they had the oil as near the Anchor works as they could place it; Sterling Bonsall, when we delivered the balance of the oil, or Charles T., both present, proposed to adjourn till 7 P. M., at Monongahela House, when they would consider the matter of receiving or rejecting the oil; this was on the second tender; at about 7 o'clock, Lockhart and myself went to Monongahela House, and found Charles T.; he said his brother had gone to the Union depot, and was expecting him down every minute; we remained waiting till near 9 o'clock for Sterling Bonsall, when a gentleman informed us he had taken the 7 P. M. train for Philadelphia; we continued there till about 10, and Charles informed us he believed it was a fact, his brother had gone to Philadelphia, and he would have to wait instructions before he could decide; Mr. Bonsall did not, nor did any one, on the 31st, offer to pay for the oil, or receive it; on Monday morning, Charles T. Bonsall said he had received no instructions; on January 2d, Monday, we received this letter, of same date from Bonsall, declining to receive the oil but giving no reason." * * *

On cross-examination he said : * * * "We brought eighty-seven cars from Oil City; the oil belonged to Lockhart & Frew; it was consigned to the Brilliant works, in Pittsburg; we always consign to these works, and distribute from them; the oil was about six miles from the office; it was about two miles from where it was to go—the Anchor works; we had all the immediate sidings filled; I tendered this oil between 4 and 5 P. M.; it was not dark; about one hour after, tendered the other certificates."

Charles Lockhart, the other plaintiff, testified : "We had over 10,000 barrels of oil, December 31st 1870, in Pittsburg, in the cars, on the sidings; filled all the sidings. The sidings at the Anchor works were filled; it would hold about twelve cars—1000 barrels. I don't know where our cars were on the siding; I know it was full; some of our cars were at the Anchor works, and some near; I saw Sterling Bonsall on morning of December 31st; I told him if he wished to examine it personally, I would give him the number of all the cars, except a few on the Brilliant siding; that the cars were there, and he could examine the oil if he chose; he did not say he would or would not; he would not talk; as soon as Bonsall gave us consignee, Anchor works, in the forenoon, 31st December, we went to the railroad; they said the siding was full, but they would put it in as soon as they could get it emptied. I think some of our cars were on it." * * *

They gave in evidence the receipt of the Allegheny Valley Railroad Company, to wit :—

"Pittsburg, December 31st 1870.

The Allegheny Valley Railroad has received from Messrs.

[Lockhart v. Bonsall.]

Lockhart & Frew the following cars of crude oil, with orders to deliver to the Anchor works, which we have done to the best of our ability, filling all the nearest switches and sidings. Said crude oil we will hold subject to their order, endorsed hereon, and will deliver at Anchor." Here follow the numbers of the cars.

The plaintiffs gave in evidence the gauger's and inspector's certificates of the gauging of the cars, as authenticated by those officers, showing the quantity of oil and that it was of the quality contracted for.

There was other evidence corroborative of that above given.

The defendants gave no evidence.

They requested the court to charge the jury that under the evidence the plaintiffs were not entitled to recover; the court so charged and the verdict was for the defendants.

The plaintiffs took a writ of error and assigned the charge of the court for error.

*I. Ash* and *J. H. Hampton* (with whom were *A. B. McCalmont* and *R. Woods*), for plaintiffs in error.—A tender of goods is good if made under such circumstances that the vendee has a reasonable opportunity of examining them in order to ascertain that they are what they purport to be: Startup v. McDonald, 6 Man. & Gr. 593. It is no objection that a larger quantity is brought to the place of tender if the vendor was ready to separate and deliver the precise quantity sold: 2 Parsons on Contracts 647. If the defendants' ground of refusal was that the 5981 barrels were more than had been bought, they should have specified the objection and it might have been remedied; not having done so, it is to be taken as waived: DeCamp v. Feay, 5 S. & R. 327. Bonsall having purposely avoided meeting plaintiff according to his appointment, cannot set up a want of tender, when he had thus prevented an opportunity to make it. They cited also Addison on Contracts 880, 1131; Henry v. Rainan, 1 Casey 361; 2 Kent's Com. 507; Williams v. Bentley, 3 Casey 294; Peck v. Hubbard, 11 Verm. 612.

*C. T. Bonsall* (with whom were *T. J. Keenan* and *D. W. Sellers*), for defendants in error.—There is no delivery by the vendor if anything remains for him to do, and there is no valid tender which obliges the vendee to set apart and segregate to make a valid delivery: Haldeman v. Duncan, 1 P. F. Smith 66; Hutchinson v. Hunter, 7 Barr 140; Golder v. Ogden, 3 Harris 528.

Mr. Justice WILLIAMS delivered the opinion of the court, April 2d 1875.

This action was brought by Lockhart & Frew against Bonsall, King & Co., to recover damages for their refusal to accept and

[Lockhart *v.* Bonsall.]

pay for 5000 barrels of crude petroleum which they bought of the plaintiffs. By the contract of sale, the petroleum was to be delivered at buyers' option, on ten days' notice, at any time on or before the 31st day of December 1870, in bulk cars or bulk boats, at Pittsburg, at such point or landing as they might designate ; for which they were to pay cash on delivery, at the rate of fourteen and one-quarter cents per gallon on lots as gauged and delivered. The plaintiffs had a similar contract in all respects for the sale and delivery of a like quantity of petroleum to Sterling Bonsall, one of the defendants, on his individual account. On the 21st of December 1870, Bonsall gave the plaintiffs written notice to deliver to him, on the 31st day of December 1870, 5000 barrels on each of the contracts, either in bulk cars or bulk boats, at Pittsburg. If delivered by the Allegheny Valley and the Western Pennsylvania Railroad, at such point as he might designate on the line of said roads ; if delivered by bulk boats, at such landing as he might designate on the Allegheny river. The plaintiffs, being unable to ascertain, by inquiry of Bonsall's agent, the place where the petroleum was to be delivered, ordered it to be shipped to Pittsburg ; and on the 30th of December they had on the sidings of the Allegheny Valley Railroad, in the city of Pittsburg, 118 bulk cars, containing over 10,000 barrels of crude oil, which, having been regularly inspected and gauged by the proper officers, was found to be of the quality and gravity called for by the contracts. On the next morning Lockhart, one of the plaintiffs, saw Bonsall and told him that if he wished to examine the oil he would give him the numbers of the cars, except a few on the Brilliant siding ; that the cars were there and he could examine them if he chose. He did not say whether he would or not—he made no reply. About ten o'clock in the forenoon he gave the plaintiffs verbal notice to deliver the oil at the Anchor works, and they immediately ordered the railroad company " to deliver the entire amount of both contracts to the Anchor works, or as near them as they could possibly get it." There was no room on the siding at the Anchor works for more than twelve cars ; and, in executing the order of the plaintiffs, the company filled the nearest switches and sidings with the cars containing the oil, in order to run them upon the Anchor siding as fast as the cars placed there should be emptied and removed. The plaintiffs had the oil regauged, and between 4 and 5 o'clock in the afternoon, as soon as they had obtained the gauger's and inspector's certificates for 5981 barrels, they tendered Bonsall 5000 barrels on the contract of Bonsall, King & Co., and at the same time they tendered him the surplus—981 barrels—on his individual contract, accompanying the tenders with a delivery of the certificates. After examining the papers for some time he declined to accept the oil, without giving any reason for the refusal. A short time afterwards,

the plaintiffs made him a tender of the oil on his individual contract, handing him at the same time the gauger's and inspector's certificates for the balance of the oil. ' The certificates handed to Bonsall in making both tenders showed that the entire quantity of oil in the cars was a little over 10,000 barrels. When the plaintiffs made the last tender they gave Bonsall the receipt of the Allegheny Valley Railroad Company for the 118 cars of oil, specifying their numbers. The receipt, omitting the numbers of the cars, is as follows: "Pittsburg, December 31st 1870. The Allegheny Valley Railroad has received from Messrs. Lockhart & Frew the following cars of crude oil, with orders to deliver to the Anchor works, which we have done to the best of our ability, filling all the nearest switches and sidings. Said crude oil we will hold subject to their order endorsed hereon, and will deliver at Anchor." Bonsall, or his brother Charles, who was acting as his legal adviser, then proposed to adjourn till 7 o'clock P. M., at the Monongahela House, when they would consider the question of receiving or rejecting the oil. But, instead of meeting them there according to his promise, Sterling Bonsall took the 7 P. M. train for Philadelphia, and Charles T. Bonsall said he would have to wait instructions before he could decide. On the 2d of January 1871 the plaintiffs received a letter from Sterling Bonsall, declining to receive the oil, without assigning any particular reason for the refusal.

These are the material facts as disclosed by the evidence; and the sole question presented by the record is, do they show such a delivery or tender of the oil as the defendants were bound to accept? If not, the court below was right in instructing the jury that the plaintiffs were not entitled to recover. But if the evidence tends to show that the plaintiffs offered in good faith to deliver the oil, and were prevented from delivering it by the improper and wrongful conduct of Bonsall in refusing to accept and pay for it, the question should have been submitted to the jury, and the court erred in withdrawing it from them by a binding direction, that under the evidence there could be no recovery by the plaintiffs. The question as to the sufficiency of the tender is somewhat complicated by the fact that Bonsall called for the delivery of the petroleum on both contracts at the same time, and did not designate the place of delivery until it was too late in the day to deliver it there. It was his duty to give reasonable and timely notice of the place of delivery, and to be there ready to receive and pay for it at the stipulated price per gallon, "in lots as gauged and delivered." The delivery was to be made in bulk cars, and if the siding at the Anchor works would have held all the cars, it would have been the plaintiffs' duty to have placed them there. But if the siding, as the evidence shows, would not hold more than twelve of the cars, what more could the plaintiffs have

[Lockhart *v.* Bonsall.]

done in the way of delivery, than to place the cars on the nearest switches and sidings, ready to be moved upon the Anchor siding as soon as there was room there to receive them? In determining the question as to the sufficiency of the tender, all the facts and circumstances connected with the transaction, and the motives by which the parties were actuated, should be taken into consideration. Did the plaintiffs offer in good faith to deliver the petroleum? And did they do all they reasonably could, under the circumstances, to make the delivery? Did Bonsall, when he designated the Anchor works as the place of delivery, know that not more than a thousand barrels in bulk could be delivered there at one time? Did he give the plaintiffs notice to deliver it there because he knew that there was not room on the siding for it and it would be impossible for the plaintiffs to make the delivery? If he had signified his willingness to receive and pay for it in "lots as gauged and delivered," were the plaintiffs ready and willing to deliver it, and would they have delivered the precise quantity called for by the contract? Would there have been any difficulty in measuring or gauging the oil as it was run or pumped from the cars into the tanks or cisterns at the Anchor works? If the oil could only be delivered at the Anchor works in lots of one thousand barrels, why should the entire quantity, called for by the contract, be separated and set apart before commencing to make the delivery? Why was it not enough that the plaintiffs had a sufficient quantity of oil to fill the contract as near the Anchor works as it could be got, and were ready to deliver it in lots as fast as the cars on the Anchor siding could be emptied and removed? It is true that Bonsall was not bound to accept a tender of a greater or less quantity of oil than the contract called for. And if the tender was for the precise quantity, he had the right to know that the plaintiffs had at least that amount and were ready in good faith to deliver it. But if they had a larger quantity than was necessary to fill the contract, what right had he to refuse the oil on this account? The contract was not for the delivery of the cars with the oil, but for the delivery of the oil in the cars. It was no part of the plaintiffs' undertaking to pump the oil from the cars and deliver it in the tanks at the Anchor works. That was the duty of the defendants, and if the plaintiffs were ready and willing to measure or gauge the oil as it was delivered so as to furnish the precise quantity, what more could the defendants have reasonably required? Why should the tender of 5000 barrels on the defendants' contract be regarded as invalid because there was a surplus of 981 barrels in the cars from which the delivery was to be made? Or why should the tender be treated as naught because the surplus was at the same time tendered on Bonsall's individual contract? The question whether Bonsall was bound to accept the tender of the 981 barrels does not arise in this case. Whether

[Lockhart *v.* Bonsall.]

it was a good tender or not, is wholly immaterial, unless its accept-
ance was made a condition precedent to the delivery of the 5000
barrels, of which there is no evidence?    There is a material differ-
ence between this case and that of Stevenson *v.* Burgin, 13 Wright
36, which the court below regarded as decisive of the question
raised here.    The contract in that case was for 100 tons of oil-cake
at $48.50 per ton, cash, to be delivered free on board vessel for
London.    The plaintiff put on board the ship Henry Cook, bound
for London, 952 bags of oil-cake, weighing per ton of 2000 pounds,
tare deducted, 107 tons and 129 pounds, and took bills of lading
therefor in his own name, which he sent to the defendants, accom-
panied with a bill of sale of the entire quantity at $48.50 per ton.
The defendants refused to receive the bills of lading and returned
them to the plaintiff, with a note informing him that his bill called
for more oil-cake than they had agreed to purchase, and that they de-
clined to receive it, or to assume control of the goods.    To this note
the plaintiff replied that he should hold the bills of lading subject
to the defendants' order for two days, and should then sell for the
best price he could get, and hold them responsible for all loss.
Accordingly, the bills not having been accepted, the plaintiff sold the
oil-cake for $44.50 per ton, and brought suit to recover the differ-
ence between the price for which it was sold and the contract price
of the 100 tons.    In delivering the opinion of the court, Strong,
J., said :  " In view of this state of the facts it is plain that there
never was any delivery of the quantity stipulated for in the con-
tract, nor any tender of it.    Instead of the quantity which the
defendants had agreed to receive, a larger quantity was offered,
and accompanied with a bill demanding payment for the whole.
It was, in effect, whatever may have been intended, an effort to
compel the defendants to take more than they had agreed to buy,
and thus substantially to change the subject of the contract.
There was no offer to deliver the 952 bags as 100 tons, nor to de-
liver any less number or quantity, or to set apart a portion of the
entire quantity in satisfaction of the plaintiff's duty.    On the
contrary, when his attention was called to the fact that the defend-
ants had not agreed to take so much, he persisted in holding the
bills of lading as they were, subject to the defendants' order, and
never intimated to them that they could have a less quantity, or
any quantity, unless they paid at the rate of $48.50 per ton for
the whole 107 tons.    In our opinion this was no such compliance
on his part with the contract as to enable him to maintain an
action against the defendants, either for the stipulated price, or
for not receiving the articles for which they had bargained."  All,
then, that that case decides is, that on a contract for a fixed quan-
tity of merchandise, to be delivered on board of a vessel, the pur-
chaser is not bound to accept and pay for a larger quantity.    But
the principle has no special application to the evidence in this case.

[Lockhart *v*. Bonsall.]

It is true that the contract here was for a specific quantity of petroleum, but it was not to be delivered on shipboard or in the tanks of the Anchor works, but in bulk cars at the Anchor works. The plaintiffs did not deliver, or offer to deliver, a larger quantity than the defendants purchased, and insist that they should accept and pay for the whole at the contract price. If they had, the case would come within the ruling of the court in the case cited, for it would have been an effort on their part to change the subject of the contract, instead of an honest endeavor to comply with its terms. If then the plaintiffs offered in good faith to deliver the petroleum, it seems to us that, under all the circumstances of the case, they were not bound, in order to make a valid tender, to set apart the precise quantity of petroleum called for by the contract, before offering to deliver it. Whether they made such a tender of the oil as the defendants were bound to accept, and were prevented from delivering it by the improper conduct of Bonsall, should have been submitted to the jury with proper instructions, and it was error to withdraw the question from their determination by the binding instruction which the court gave in answer to the defendants' sixth point.

Judgment reversed, and a *venire facias de novo* awarded.