# R. L. BROWNFIELD ET AL. v. L. JOHNSON ET AL.

## ERROR TO THE COURT OF COMMON PLEAS NO. 2 OF PHILA-DELPHIA COUNTY.

Argued April 11, 1889—Decided October 7, 1889.

[To be reported.]

(*a*) The defendants ordered the purchase for them by the plaintiffs, upon a commission, of a certain quantity of brazil-nuts. The plaintiffs transmitted the order to their correspondents at Para, Brazil, who to obtain the quantity ordered were obliged to purchase in two lots, which though of the same quality made a larger quantity than that ordered.

(*b*) The nuts were shipped in bulk, according the usual course of trade, the two lots mixed together but in a separate hold and consigned to the plaintiffs, who invoiced to the defendants the quantity covered by the order and tendered delivery thereof out of the entire consignment made up of the two lots purchased.

1. By force of the order the plaintiffs became the defendants' agents with authority to constitute an agent at Para for its execution, and, the nuts being bought under the authority conferred, the quantity of nuts ordered became the property of the defendants when purchased for them in Brazil.

2. The defendants were affected with a knowledge that the nuts would be shipped in the usual manner; the duty of measuring them and their removal from the vessel was upon the defendants; the nuts being of uniform quality selection was of no consequence, and the defendants were bound to accept and pay for the quantity ordered.

Before GREEN, CLARK, WILLIAMS, McCOLLUM and MITCH-ELL, JJ.

No. 240 January Term 1889, Sup. Ct.; court below, No. 70 June Term 1887, C. P. No. 2.

On May 5, 1887, Lawrence Johnson, R. W. Johnson and Antonia Sans, trading as Lawrence Johnson & Co., brought assumpsit against Robert L. Brownfield and H. P. Lummis, trading as Brownfield & Co. The statement charged that the plaintiffs had purchased for the defendants 400 hectolitres of brazil-nuts on the order of defendants; that defendants refused to accept them when delivery was tendered, and that plaintiffs were obliged to sell the nuts at a less price than they had paid

for them, thereby sustaining damage. The defendants pleaded non-assumpsit.

At the trial on October 17, 1888, it was made to appear that on December 2, 1886, the defendants gave an order to the plaintiffs to purchase for their account, in Para, Brazil, 400 hectolitres (about 1200 bushels), brazil-nuts, best quality, to be paid for on arrival, for a commission of five per centum, including buyer's brokerage in Brazil, the plaintiffs' correspondent to cable at time of shipment the price paid for the nuts, which were to be shipped in bulk. This order the plaintiffs transmitted to La Roque, Da Costa & Co., of Para, for execution, dividing commissions with them, and on February 9, 1887, the plaintiffs advised the defendants that by cable received on that date from Brazil their order of December 2d for 400 hectolitres brazil-nuts had been purchased and shipped per steamship Portuense and that the nuts cost to sell about eight cents per pound.

The Portuense arrived in New York on March 3, 1887, and the next day the plaintiffs sent defendants an invoice for 312 hectolitres, at the price of 15,150 reis per hectolitre, and 88 hectolitres, at 14,000 reis per hectolitre, and an account in which the defendants were charged for customs duties, freight, insurance, brokerage, and all other expenses, from the purchase in Para until the arrival in New York. This invoice and account were accompanied by a delivery order from the plaintiffs on their storekeeper in Brooklyn, directing him to deliver 400 hectolitres brazil-nuts, in separate hold, to the defendants.

One of the defendants, with the delivery order in his possession, went to New York to receive the nuts and went on board the vessel, where he asked the officer in charge to show him the consignment of nuts. The officer exhibited a plan of the vessel showing the location in the hold of various consignments of nuts to different parties, but there was no consignment to the defendants. The defendant partner then called upon the plaintiffs' store-keeper, who tendered delivery of 400 hectolitres of nuts out of 582 hectolitres, which had been consigned in a separate hold to the plaintiffs. The defendants refused to accept the delivery. The plaintiffs then tendered to the defendants the 582 hectolitres, or 400 hectolitres, at their option, at the invoiced prices. The defendants declined to accept

either tender. The plaintiffs afterwards tendered 400 hectolitres at the average price, which was also declined. The plaintiffs subsequently separated 400 hectolitres from the lot, notified the defendants of the weight and the cost of weighing, but the defendants refused absolutely to accept any of the nuts tendered.

The nuts consigned in the separate hold to the plaintiffs had been bought at auction in Brazil in two different lots. The first lot contained 312 hectolitres. The second contained 270 hectolitres, and was bought to cover the order, because the purchaser was obliged to take a boat load. The two lots were of uniform quality and had been shipped together to the plaintiffs, who had paid their correspondent for them. Importers at New Nork testified that these nuts when of the same quality usually arrived in bulk, and that each party entitled had the quantity due to him weighed out of the common lot. On the refusal of the defendants to accept delivery, the plaintiffs sold the nuts at private sale at 4½ cents per pound, and in this action sought to recover the loss.

At the close of the testimony, the court, MITCHELL, J., charged the jury, in part as follows:

This is an action by the plaintiffs, L. Johnson & Co., to recover from the defendants, R. L. Brownfield & Co., for money which the plaintiffs claim to have expended on the order of the defendants.

You will recollect R. L. Brownfield & Co., the defendants, gave the plaintiffs an order to transmit to Brazil, for the purchase of 400 hectolitres of these brazil-nuts. By giving such an order the defendants made the plaintiffs their agents to appoint an agent in Brazil to make this purchase, and the plaintiffs were bound on the one hand to carry out that order as nearly as possible in the way that it had been given, and on the other hand they are entitled to the money which they have in good faith expended in the performance of that duty.

In point of fact there were sent to New York by the ship which arrived, I think it was some time in February, 1887, 582 hectolitres of these brazil-nuts consigned to the plaintiffs. The plaintiffs say that they were bought at auction. One of the witnesses said yesterday these nuts are brought down the river in boats, and they are sold at auction in boat loads, and in

order to buy 400 hectolitres they had to buy 582. In other words, they bought a first lot of 312 hectolitres, and then in order to make up the 400 they had to buy a second lot of 270. Ordinarily a tender of 582 measures of any kind, bushels or anything else, is not a good tender for 400. As counsel have already said to you, when a general order is given of this kind, it is not to be expected there will be an absolute, literal compliance with it. [If there had been 390 or 410 hectolitres, according to the ordinary dealings of men that would have been a fair compliance, but ordinarily a tender of 582 is not a good tender for 400, the discrepancy is too large. But the plaintiffs claim in this case they were obliged, in order to get the 400 to buy the 582, and when they were sent to New York, the plaintiffs gave the defendants their choice either to take the whole lot of them, or to take 400 hectolitres out of this lot of 582 which had been sent. So far as a tender of the proper amount is concerned, that would be a good tender; that is to say, although there were 582 there, yet the plaintiffs did not, in fact, say to the defendants, you must take the 582; they simply said, " We have got 582, which we had to buy in order to get 400; you can take the 400 you ordered, or you can take the whole 582 if you want them." So far I see no reason to complain of the action of the plaintiffs in that behalf.] [1]

That brings us to another point, which is perhaps the most disputed point in the case, and that is the mode of shipping and delivering. I need hardly say to you, as a general rule a man is entitled to the exact thing that he buys. If you buy a horse or a chair or anything of that kind, you are entitled to the exact thing. It will not do for the seller to say, " Here is another that is just the same," or, " just as good." That may be a difference of opinion, or it may be a matter of fancy. You are entitled to the exact thing which you buy. That is the ordinary rule in the case of purchases and sales, but there are some things that are not dealt in, in the ordinary course of business, in that way; they are not dealt in as single or individual things, but as a mass. Perhaps the strongest illustration I could think of at present is the case of money. When you deposit money in a bank, if you put one hundred dollars in, you never expect to get that particular one hundred dollars back again. You get some other hundred dollars, or get it in

Charge of Court below.

smaller amounts, as you please; because on the understanding of business people one dollar is as good as another dollar, and the money goes to the bank and is dealt with as a mass. So there are other things. The papers have been recently filled, as you have all no doubt noticed, about dealing in what is called the wheat pit in Chicago, where wheat which is put into elevators there is sold by the millions of bushels and no particular grains of wheat are supposed to pass by contracts of that kind, but it is so much wheat of a certain quality. Sometimes it has other peculiarities, spring wheat or fall wheat, or red wheat, or other particular descriptions; but it is dealt with not as individual articles, but in bulk. [The question for you to consider is, whether the course of business that has been shown to you as to the shipping of brazil-nuts in the course of trade between Para, Brazil, and the city of New York, which is the main port of entry for them, is to ship them in bulk, and whether the plaintiffs were authorized, therefore, when they shipped these things through their agents in Para to ship them in that way.] [2]

If you will recollect, the correspondence indicates they were to be shipped in bulk so far as they were not to be put in separate bags. In the original order, in the beginning of the correspondence, the defendants said they wanted so many bags, and they were informed by the plaintiffs that brazil-nuts were not sold in Brazil by the bag, but sold in bulk and estimated by the hectolitre, and one of the letters which was read to you by the counsel, in summing up here, shows that the defendants were notified that the goods would arrive in bulk in New York and they would have to furnish their own bags. Therefore, so far as the mere shipping of these in bulk is concerned, there is no cause of complaint, but the defendants do complain that the special lot which they ordered of 400 were not kept separate and apart. [As I have already said, if it had been specified articles which they had bought, they were entitled to have them kept separate and entitled to the very thing which they bought, but if it is the course of trade, established to your satisfaction by the testimony read to you, that these things are dealt with in bulk and that all that is required is that there shall be so many bushels or so many hectolitres delivered of the same substantial quality out of the larger mass, then the

Charge of Court below.

plaintiffs were entitled to do as they did,] [3] to say, " Here are your 400 hectolitres. It is true they are in a mass of 582, but they are substantially the same thing, and you can have your 400, or if you desire you can take the whole 582."

[The defendants were not bound of course to take their goods if they had been mixed with an inferior or different class of goods, because that would be a mixing which would be to the prejudice of the defendants. If they bought and paid a high price for any specially good article, they were entitled to have that article. But if the mixture was a mere mixture with other goods of the same quality, and after the 400 were measured out they were just as good and the same as if they had been originally measured out in Brazil and sent here separately, then the plaintiffs have done all they were required to do.] [4]

That leaves me to consider the question of price. You will recollect the instructions of the plaintiffs to their agents at Para were to buy about 400 hectolitres on account of the defendants. They were bound as agents to buy in good faith at the lowest price that they could buy, but on the other hand they were entitled to give whatever was requisite in order to make this purchase, and they have said, in point of fact, they were able only to buy the 312, the first lot which they bought, and afterwards they made up their purchase of 400 by buying this other lot of 270. [Whether they are entitled to bill that first lot of 312 at the highest price, of course depends upon whether in good faith they did buy those 312 hectolitres for the defendants. If they did, it is no objection and they ought not to be charged with it because afterwards they were able to buy a lot more or less large at a smaller price.] [5]

Mr. Johnson: The claim is made out on the basis of the average.

By the court: As I understand, the plaintiffs have now made their claim and are willing to make it on the average price of the whole. I will illustrate the rule. As you probably have all been at auction one time or the other, you will remember, if it so happens there are two articles of the same kind on the catalogue, there is a good deal of a chance whether you get the first one that is put up cheaper or the second one. The only articles I ever buy myself at auction are books, and I find

Charge of Court below.

it hard to tell, where there are two books of the same kind on the catalogue, whether you can get the first one cheaper, or whether by taking your chances to get the second one cheaper you do not find some other man may have the same idea and you have to pay more for the second than the first. That is one of the chances in the auction business. [That is what I understand the plaintiffs substantially claim took place in this instance; that they bought the 312 hectolitres for the defendants and they were able afterwards to make the second purchase at a somewhat smaller price. They are entitled to the price which they, in good faith, paid.] [6]

When these nuts arrived in New York, correspondence and negotiations at some length took place, which you have heard, between these parties. The defendants refused to receive the nuts and they were sold at the plaintiffs' order, and the plaintiffs now claim the difference between what they realized on that sale and the price which the defendant agreed to pay, which the plaintiffs paid out to their agents in Brazil. Some comment has been made by the counsel for the defence, dwelling upon this point somewhat at length, that this was shown not to be a fair sale by the fact that an inferior quality sold within a few days in New York for a quarter of a cent higher. That is a question for you to consider upon the whole evidence, and the only bearing it has is, that this sale of course must have been a sale in good faith. Counsel in addressing you in behalf of the plaintiffs read to you the notice that the defendants got, that they had this offer to sell at four and a half cents, and giving the defendants notice, if they considered it was too cheap and wanted to take them at a higher price, they were at liberty to do so.

[On the whole case the right of the plaintiffs to recover depends very largely on the question of good faith and of the ordinary course of business.] [7] They had acted as agents for the defendants and they were bound on the one hand to exercise good faith to buy these nuts at the lowest price they could, and to get them to New York as nearly as possible in the way they had been ordered. On the other hand they are entitled, if they have expended money in good faith in carrying out the orders of the defendants, to be reimbursed. It is for you to say how much that will be.

Charge of Court below.

The defendants request the court to charge the jury:

1. The defendants having given the plaintiffs an order to purchase in Brazil for his account and risk 400 hectolitres, new crop, usual merchantable good quality brazil-nuts, the order is not complied with by the purchase of 582 hectolitres.[8]

2. If the jury believe from the evidence that the defendants gave the plaintiffs an order to purchase in Brazil for his account and risk 400 hectolitres, new crop, usual merchantable good quality brazil-nuts, that the plaintiffs transmitted this order to Para, Brazil, for execution and it was there executed by the purchase of one lot of 312 hectolitres at one price, and the purchase of another lot of 270 hectolitres at a lower price, and these two lots were mixed and shipped together to a port of New York, that defendants were not bound to accept delivery of 400 hectolitres in New York out of these two lots.[9]

3. In giving the order in this case the defendants made the plaintiffs their agents with authority to constitute an agent in Brazil for the execution of the order, and it thereupon became the duty of such agent to comply with the order by the purchase of the quantity within a reasonable margin more or less of the quality ordered.[10]

4. The order given in this case contemplated its execution in Brazil, subject only to payment in accordance with the terms of the order, by the defendants, upon the receipt of the nuts.[11]

5. The purchase of 582 hectolitres brazil-nuts was not a proper execution of the order to buy 400 hectolitres of brazil-nuts.[12]

6. The defendants were not bound to accept 582 hectolitres on an order for 400 hectolitres.[13]

7. There is no sufficient evidence in this cause from which the jury can find a custom authorizing the mixing of one man's goods with another's, and the delivery to each in proportion to the original shipments.[14]

8. There is no sufficient evidence in this cause from which the jury can find a custom authorizing commission merchants, having orders to fill for brazil-nuts in Brazil, to execute the same by mixing the several shipments together, and on arrival in New York delivering to each person ordering the same a proportionate amount of the whole shipment.[15]

9. If the jury believe from the evidence that the plaintiffs

have no interest in the present suit, nor any liability to their correspondent in Para in reference to the brazil-nuts in controversy, they cannot maintain the present action.[16]

10. Under the evidence in this cause the verdict must be for the defendants.[17]

Answer: The points are all refused, except so far as answered in the general charge.[8 to 17]

The jury returned a verdict in favor of plaintiffs for $1,627.48. A rule for a new trial having been discharged, judgment was entered on the verdict, when the defendants took this writ, assigning as error:

1–7. The portions of the charge included in [ ] [1 to 7]

8–17. The answers to the defendants' points. [8 to 17]

*Mr. M. Hampton Todd,* for the plaintiffs in error:

1. The scope of the charge seems to be that if the jury believed that the two lots of nuts were of substantially the same quality, and that the evidence showed a course of trade authorizing the shipment in bulk of several consignments together, then the defendants were bound to accept the 400 hectolitres out of the 582, and to make the separation themselves; and if the jury believed the plaintiffs had bought in good faith the 312 hectolitres in part execution of the order, then, notwithstanding their having been mixed with lower priced nuts, the defendants were bound to pay for all the higher priced nuts. We submit that the authorities fully sustain the position of the defendants that it was the plaintiffs' duty to have the order executed by the purchase within a reasonable margin of 400 litres, which should have been shipped under a separate bill of lading and separate from the consignments to other buyers: Clark v. Wright, 5 Phila. 439; Norrington v. Wright, 115 U. S. 188; Hare on Contracts, 569, 570; Bowers v. Sand, 2 App. C. 455; Welsh v. Gossler, 89 N. Y. 540; Filley v. Pope, 115 U. S. 213; Cash v. Hinkle, 36 Ia. 623; Bostock v. Jardine, 3 H. & C. 700 (11 Jur. N. S. 586); Tamvaco v. Lucas, 102 E. C. L. 581; Benj. on Sales, Bennet's ed., 534; Blackburn on Cont. of Sale, 215*; Haldeman v. Duncan, 51 Pa. 66; Stevenson v. Burgin, 49 Pa. 44; Schmertz v. Dwyer, 53 Pa. 335.

2. The plaintiffs recognized that they could not sustain their

case on the contract as it was written, and therefore they attempted to justify the plain evasion of the terms of the order by endeavoring to prove a custom of the trade justifying their method of executing the order. It is too plain for argument that the kind of testimony adduced would not establish a custom. A custom must be ancient, notorious, continued, reasonable and compulsory. It was held half a century since that all customs which intrench on the common law ought to be taken strictly, nay, very strictly, and that where the law and a custom conflict, the former must stand and the latter go down: Coxe v. Heisley, 19 Pa. 243. Under the evidence, therefore, the plaintiffs having failed to show compliance with the order given, and having failed to establish a custom of trade which would authorize the variance in this case, the court should have instructed the jury to find for the defendants, as requested in the defendants' tenth point.

*Mr. John G. Johnson*, for the defendants in error:

1. There is no doubt, under the testimony, that the plaintiffs, as agents for the defendants, in good faith bought 400 hectolitres of nuts of best quality; that these nuts were paid for by them; that they were shipped to this country in a separate hold in connection with 182 hectolitres of nuts of like quality bought at the same time to insure the purchase of the 400 hectolitres; that they were duly tendered to the defendants, who were allowed to take, at their option, the whole lot, or only 400 hectolitres thereout; that brazil-nuts arrived in this country in bulk in the holds of steamers; and that they were not usually kept separate where of the same quality, but that like grain, they were delivered to the consignees of the various lots out of the bulk.

2. Is there any rule of law which compels an agent to ship goods bought for his principal in other than the usual way? When La Roque, Da Costa & Co. bought they were at liberty to separate, after the purchase and delivery to them. Had they done so, and had they shipped the 400 separately, Brownfield & Co. would certainly have been bound to take. How were they hurt, though this separation was not made at Para, if the shipment was made in the usual way, so that the separation could be made on arrival? The title to the nuts vested in

the defendants after the vendors at Para had sold to La Roque, Da Costa & Co., and after the vendors had been paid for them and had delivered them. Of the one lot of 270 hectolitres, 88 were bought for defendants and 182 for their agents. The law as to the ownership of a fixed quantity of goods included in a shipment of like articles is stated in Hare on Contracts, 425; Jackson v. Anderson, 4 Taunt. 28; Gardner v. Dutch, 9 Mass. 430.

3. La Roque, Da Costa & Co. did not separate the nuts, as they might have done, at Para; but, in accordance with the usage of trade, shipped the whole lot mixed with the 312 hectolitres previously bought, in order that they might be separated at New York. Was there such a usage? The question which was fairly put to the jury was, not was there a custom in violation of a contract, but was there a usage as to the manner of shipping brazil-nuts of like quality? Were they usually kept separate, or were they sent mixed in bulk? There was an abundance of testimony to sustain the claim of the plaintiffs, and the jury found that there was such a usage as was followed in this case. If the brazil-nuts were bought for Brownfield & Co. in good faith, and if they were shipped here in the usual mode of shipment, where was wrong done to the latter? Did the mixture injure them? Was the failure to put into separate bins such an omission as destroyed the title vested in them? Was this a failure to ship in accordance with what was usual? The testimony was overwhelmingly to the effect that it was not.

OPINION, MR. JUSTICE CLARK:

A complete understanding of the rules of law governing this case involves a brief statement of the material facts. On the second day of December, 1886, Brownfield & Co., the defendants, gave an order to Lawrence Johnson & Co. to purchase for them in Brazil 300 bags best quality of new brazil-nuts of the first receipts; payment to be made in cash on arrival, or by sixty day note, etc., at the defendants' option; the plaintiffs to cable price at the time of shipment. On the same day the plaintiffs replied, stating that brazil-nuts were not bought by the bag, but by hectolitres, a measure which in past years averaged from 100 to 120 pounds; that the nuts came in bulk

in the steamer, and the defendants would have to furnish the bags on arrival in New York; and as "the out-turn of the measure is uncertain" they proposed to order 450 hectolitres, etc. To this the defendants replied by telephone, "Order 400 hectolitres and buy only the very best nuts obtainable."

The plaintiffs placed the order in the hands of their correspondents, La Roque, Da Costa & Co., Para, Brazil, who undertook the purchase, and on the 9th of February following advised the plaintiffs of shipment per steamer Portuense, upon board of which were nearly 6000 hectolitres of brazil-nuts for other parties. Of this shipment and of the price, notice was on the same day given to the defendants. Upon the arrival of the Portuense in New York, Lawrence Johnson & Co. handed to the defendants a delivery order for 400 hectolitres brazil-nuts, in bulk, in separate hold, on board the Portuense, with copy of original invoice and the plaintiffs' bill, amounting to $3,441.18.

The invoice was for 312 hectolitres at 15,150 reis each and 88 hectolitres at 14,000 reis each; showing that the nuts had been originally purchased in two separate lots, and at different prices. The defendants, with the delivery order in their possession, proceeded to New York and went on board the Portuense, where they found no consignment of nuts in the name of Brownfield & Co., but the plaintiffs' store-keeper informed them that the 400 hectolitres in question, were embraced in a consignment of 582 hectolitres of brazil-nuts, in separate hold, in the name of the plaintiffs. The defendants thereupon refused to receive any portion of these nuts as an execution of their order. The plaintiffs tendered to the defendants the whole 582 hectolitres, or 400 hectolitres thereof, at their option, at the invoiced prices, which tender in either alternative the defendants declined to accept. The plaintiffs afterwards tendered 400 hectolitres at the average price, which the defendants also declined; subsequently, the plaintiffs separated the 400 hectolitres from the lot and notified the defendants of their weight, but the defendants absolutely declined to accept the nuts on any of the several propositions made by the plaintiffs.

The 582 hectolitres were made up of two lots, one of 312 hectolitres, invoiced at 15,150 reis; the other of 270 hectolitres, invoiced at 14,000 reis; 88 hectolitres of the latter were in-

voiced to the defendants, and the residue, being 182 hectolitres, to Lawrence Johnson & Co. for account of La Roque, Da Costa & Co., who, it is said, according to the method of dealing in Brazil, in order to get 88 hectolitres to fill the order were obliged to buy a larger lot. That all parties acted in good faith is a fact found by the jury, and the case turns upon the question whether the defendants' order was properly and legally executed.

If the purchase had been of 400 hectolitres only, shipped in separate hold, there could be no question as to the defendants' liability for the price. What, then, was the effect of placing the 182 hectolitres in the same hold with the 400 invoiced to the defendants? It may be conceded, as a general rule, that, as between vendor and vendee, when it is sought to compel a party to pay for goods which he has refused to accept, there can be no recovery unless the order has been strictly and literally fulfilled. The buyer is entitled to refuse the whole of the goods tendered, if they exceed the quantity agreed, and the vendor has no right to insist upon the buyer's acceptance of all, or upon the buyer's selecting out of a larger quantity delivered: Benj. on Sales, § 1030; to the same effect are the cases cited by the plaintiffs in error. With reference to quantity, however, the rule is less rigid where goods are ordered from a correspondent who is agent for buying them: Ireland v. Livingston, L. R. 2 Q. B. 99; for the relation of vendor and vendee, which finally results, is preceded by the relation of principal and agent, and the agent in such a transaction is necessarily invested with some degree of discretion in making the purchase. See also Johnson v. Kershaw, L. R. 2 Exch. 82; 36 L. J. Exch. 44; and Jefferson v. Querner, 30 L. T. (N. S.) 867. It must be conceded, however, that the purchase and tender of 582 hectolitres upon an order for 400, would involve a wider discretion than would be allowable under the special facts of this case, even as between principal and agent.

In this case, however, the plaintiffs' correspondent purchased for and invoiced to the defendants 400 hectolitres only, and that quantity was tendered; the remaining 182 hectolitres were not invoiced to the defendants, although the plaintiffs proposed that the defendants might have them if they chose to

take them.　The 400 hectolitres of nuts unquestionably became the property of the defendants when purchased in Brazil, for they were purchased upon their order.　By force of that order the plaintiffs became the defendants' agent with authority to constitute an agent in Para for its execution, and the nuts were bought in virtue of the authority thus conferred.　The only question, therefore, would seem to be upon the effect of the shipping of the whole lot of 582 hectolitres in one hold. It was shown that this was the usual method of shipping, especially when the orders were small.　There was no effort to establish a custom of this kind, but simply to show that this was the usual and ordinary method pursued in the shipping trade.　The defendant had a right to suppose these goods would be shipped in the usual manner, unless he directed otherwise, and that although intermingled with others in the forward hold of the vessel for transportation, they would be separated at the place of delivery.　The nuts in question were of the same quality; they were bought at different prices, but the evidence is clear that they were of uniform quality.　The weight of American authority supports the proposition that when property is sold to be taken out of a specific mass of uniform quality, title will pass at once upon the making of the contract, if such appears to be the intent.　Oil in a tank and grain in an elevator may serve as illustrations of this rule. Where, however, the property is sold as part of a mass made up of units of unequal quality or value, such as cattle in a herd, selection is essential to the execution of the contract, and of course the rule cannot apply: Benj. on Sales, 477–531, and cases there cited.　The storage of oil in tanks and of grain in elevators, although not universal, is the usual and ordinary means employed by large dealers in those commodities, and, whilst no custom of that kind, technically speaking, could be established, the usage of the trade and general course of business in this country is well known.　In view of the necessities which grow out of such usage, the American courts have departed from the rule adhered to in England, and have recognized a rule for the delivery of this class of property more in conformity with the commercial usages of the country.　A distinction is made between those cases where the act of separa-

tion is burdensome and expensive or involves selection, and those where the article is uniform in bulk and the act of separation throws no additional burden on the buyer.   In the latter class of cases a tender of too much, from which the buyer is to take the proper quantity, is a good delivery: Benj. on Sales, 1030, note.   See also Timberly v. Patchin, 19 N. Y. 130; Hutchison v. Commonwealth, 82 Pa. 472; Wilkinson v. Stewart, 85 Pa. 255; Bretz v. Diehl, 117 Pa. 589.

The case at bar bears no analogy whatever to Stevenson v. Burgin, 49 Pa. 44; for all that is decided by that case is, "that in a contract for a fixed quantity of merchandise to be delivered on board a vessel, the purchaser is not bound to accept *and pay* for a larger quantity."   The principle has no application to the evidence in this case.   The case at bar bears a closer analogy to Lockhart v. Bonsall, 77 Pa. 53.   In that case a tender of 5000 barrels of oil was made by Lockhart to Bonsall out of a bulk of 5981 barrels contained in 118 bulk cars.   As it was the duty of Bonsall to pump the oil from the cars into the tanks of the Anchor Works, which had been designated as the place of delivery, it was held that Lockhart was not bound to set apart the precise quantity named in the contract before offering to deliver.   So here, the measuring of the nuts and their removal from the vessel was the work of the defendants, and as the article was uniform in bulk, selection was of no consequence; nor, was the act in any sense burdensome or expensive, for, assuming that the whole bulk was to be measured, yet the expense attached to the whole and each part owner was liable to share it.

We are of opinion that when the nuts were delivered on board the Portuense at Para, the title to $\frac{400}{582}$ of the bulk belonged to the defendants, and that upon the arrival of the vessel at New York the tender of the 582 hectolitres from which the defendants were invited to take their share was a good delivery.

The judgment is affirmed.