[Civ. No. 2842. Third Appellate District.—November 18, 1925.]

# W. E. WANEE, Respondent, v. C. F. THOMAS et al., Appellants.

[1] SALES—PASSING OF TITLE—INTENT OF PARTIES—EVIDENCE.—The intention of the parties to a sales contract as to the time the title shall pass is to be gathered from the language of the contract considered in the light of all the circumstances, but, if nothing is said in the contract, whether the contract be oral or written, expressing the intention of the parties, the question whether the title passed *in praesenti* is to be determined from all the circumstances, the acts to be performed by the respective parties, if any, and the rules of law applicable thereto.

[2] ID.—IDENTITY OF GOODS—SALE BY SAMPLE—ASCERTAINMENT OF QUALITY AND QUANTITY—SEGREGATION—WHEN TITLE PASSES.—If the goods sold are identified, the mere fact that they are to be weighed in order to ascertain the price does not offer any reason for concluding that the title has not passed; but when it is necessary to sample the goods to determine their quality and so ascertain and identify the goods as well as the quantity of the goods that the buyer is bound to accept under his contract, the title does not pass until the quality of the goods

---

1. See 22 Cal. Jur. 948; 24 R. C. L. 15.
2. See 22 Cal. Jur. 950; 24 R. C. L. 22, 24.

has been ascertained and segregation made thereof between the goods of the quality bargained for and those of an inferior grade.

[3] ID. — SALE OF RICE — SUBSEQUENT GRADING AND SEGREGATION — TITLE.—Where a contract for the sale of rice provides that the rice is to be graded and gives the buyers the right to reject all the rice not equal to the sample submitted to them, and the contract is silent upon the question when the title shall pass, the title to the rice remains in the seller until the segregation and grading has taken place.

(1) 35 Cyc., p. 277, n. 9, 12, p. 278, n. 17, 20, 21, 22.   (2) 35 Cyc., p. 281, n. 38, p. 283, n. 64, p. 291, n. 30, p. 292, n. 42, p. 295, n. 57.   (3) 35 Cyc., p. 288, n. 1, 2, 99; 37 Cyc., p. 792, n. 87.

APPEAL from a judgment of the Superior Court of Tehama County. John F. Ellison, Judge. Reversed.

The facts are stated in the opinion of the court.

Elmer W. Armfield and Arthur B. Eddy for Appellants.

McCoy & Gans for Respondent.

PLUMMER, J.—On or about the fifteenth day of February, 1922, plaintiff being the owner of some 6,000 sacks of rice, agreed to sell the same to the defendants for the sum of $2.41 per hundred pounds, subject to grading, rice to be delivered f. o. b. cars at Proberta station, in the county of Tehama. The rice was all piled or stored in a barn belonging to the plaintiff situate in the county above mentioned about a mile and a half distant from Proberta station. At the time of the entering into the contract relative to the sale of the said rice, the sum of $4,000 was paid on account thereof. During the course of delivery $10,000 additional was paid, and on or about March 10th, upon final delivery of all of the rice, the balance of the purchase price, amounting to $6,472.79 was paid. It also appears from the transcript that at the time of the making of the agreement concerning the sale of the rice, the plaintiff also sold to the defendants certain barley stored in a warehouse for the sum of $2,858.34 and received payment therefor immediately and on said date turned over and delivered to

3. See 22 Cal. Jur. 951.

the defendants a warehouse receipt for the portion so sold. After the transactions above referred to had been had, it appears that a portion of the rice had been graded and delivered f. o. b. on the cars at Proberta, assigned to the defendants, but at 12 o'clock noon on the first Monday in March there still remained in the plaintiff's barn 313 tons of rice unpaid for, ungraded and undelivered. Under these circumstances, the assessor of the county of Tehama assessed the said 313 tons to the plaintiff and collected from the plaintiff on account of such assessment the sum of $303.61. This action was brought by the plaintiff to recover said amount from the defendants, basing his action on the claim that the title to the rice vested in the defendants immediately on the fifteenth day of February, 1922. The plaintiff obtained judgment and from this judgment the defendants appeal.

It appears from the transcript that Mr. Erle Gans, president of the Bank of Tehama County, conducted all the negotiations on the part of the plaintiff and George B. Champlin on the part of the defendants. The Bank of Tehama County, of which Mr. Gans was president, was then holding a chattel mortgage on the crop of rice and barley grown and owned by the plaintiff. The rice in question was all raised by the plaintiff in the year 1921 and stored in a barn situate on the ranch where it was raised. Prior to the sale of the rice a sample thereof was furnished by the plaintiff to George B. Champlin, the agent of the defendants, who communicated with the defendants and was authorized by them to purchase the rice at the price stated, subject to grading, delivered f. o. b. cars at Proberta. It is agreed by both parties that the sale was made as per the terms herein stated. Three hundred sacks of the rice in the barn were to be retained by the plaintiff for seeding purposes. The testimony of Mr. Gans, who conducted the negotiations for the plaintiff, is as follows: "We had a crop mortgage on that rice and desired to sell it—We had negotiated with Mr. Champlin, among different ones, for the sale of the rice. Mr. Champlin was acting for Thomas, Stephens & Mattei. After some dickering around, Mr. Champlin agreed on—Mr. Champlin and myself agreed on a price, and Mr. Champlin brought a draft for $4,000 on account—drew a draft for that amount on account—and

we considered the sale made. As near as my recollection serves me, it was 2.41 per hundred pounds. The quantity of rice was somewhere in the neighborhood of 6000 bags— more or less. The payment of the $4000 was made February 15th. That is the date of the sale or contract. At the same time we sold some barley. I do not remember the number of sacks. The amount paid for the barley for $2858.34. It was paid in a separate draft from the $4000. The barley was completely paid for. I delivered the warehouse receipts to Mr. Champlin. On March 8th $10,000 more was paid on account of the rice. On March 10th final payment was made. The rice was to be delivered as soon as could be, taking into consideration the condition of the weather. Q. Can you recall anything else that was said, either by you or by Mr Wanee or Mr. Champlin, in the matter of those negotiations and in closing the deal. A. Well, there was very little said as to the matter, except in arriving at the price, and Mr. Wanee's statement that there might be a delay in getting the stuff to the railroad. Q. What was said at the time as to the payments on the price, if anything? A. I do not recall that there was anything said about it. Q. But the sum of $4000 was paid there at the time the transaction was had, on the sale and purchase price? A. Yes, sir. Q. I understood you to say that Mr. Wanee was to deliver this rice to Proberta. That was, I suppose, f. o. b., was it not—that he was to deliver it at his cost? A. Well, there was no particular discussion about that, as I recall. Q. Was he to deliver it, as I understand your testimony, to Proberta? A. Yes, sir. Q. Was anything said as to delivery to Proberta being at his own expense, or on account of someone else, or was that discussed at all? A. I don't recall that it was. Q. Was the rice to be graded? A. Yes, sir. Q. What does grading mean? A. All I can tell you about it is, that a sampler stands there, takes some out, looks at it and passes it, or he does not pass it. Q. If he does pass it, what does he do with it? A. Sets it aside. Q. Rejects it? A. Sometimes it is taken later at a different price. Q. Was anything said in the conversation when this sale and purchase was made about paying for this rice at a price other than 2.41? A. Not that I recall.''

The testimony of George B. Champlin in relation to the purchase of the rice was substantially to the same effect. It is as follows: "The deal was finally closed in my office. They were offering this rice for sale. They had been in to see me on one or two occasions, and finally the price agreed on was 2.41 f. o. b. cars Proberta, subject to grade."

This witness also testified that "subject to grading" meant: that the pile of rice was to be torn down and the different sacks sampled, the buyer to take the sacks containing rice equal in grade to the sample with the privilege of rejecting sacks containing rice not equal to the sample. It further appears from the transcript that a grader by the name of McClure was employed who graded the rice so piled in different piles and rejected somewhere in the neighborhood of 100 sacks thereof. The witness McClure testified that, in practice, the rejected rice ran all the way from 1 to 60% of the quantity of rice graded, depending upon whether the rice had been damaged by rain prior to harvesting, and, also, whether it had been protected from damage by rains after being harvested and stored; that in the instant case only a small percentage of the sacks were damaged by moisture; also, that where the rejected rice was of merchantable quality, it was usually disposed of upon subsequent contracts of sale at a lower price, but, in the case at bar, none of the rejected rice was afterwards taken. The testimony further shows that a $15,000 policy of insurance was taken out by the bank in the name of the plaintiff upon the rice, made payable to the mortgagee bank, and that this policy was not assigned to the defendants, but retained by the bank until final delivery and payment of the rice had been made, when the policy was canceled. The transcript does not show any testimony that anything was said by any of the parties indicating an intent to immediately pass title to the property. All there is in the transcript is the statement of the witness Gans, expressed in these words: "and we considered the sale made."

On the part of the appellants it is contended that until the rice had been graded and segregated or set aside, there was no identification of the property, and it could not be determined until after grading just what rice the buyer would take, and also, further, that title would not vest in the buyer until it was delivered f. o. b. cars at Proberta.

On the part of the plaintiff and respondent it is insisted
that the transaction in question is governed by section
1140 of the Civil Code, which reads: "The title to personal
property, sold or exchanged, passes to the buyer whenever
the parties agree upon a present transfer, and the thing
itself is identified, whether it is separated from other things
or not."

The agreement between the parties was oral and, as we
have said, there is no testimony one way or the other that
the parties agreed upon a "present transfer" of the title.
The parties agreed upon a price, agreed upon what was
to be done, and $4,000 was paid on account. The complaint
in the case, after setting forth certain formal matters,
alleged: the purchase of the rice for the agreed price of
$2.41 per hundred pounds; that at the time of the sale
and purchase defendants paid to plaintiff on account of
said sale the sum of $4,000; "that said parties then and
there agreed upon the present transfer of said rice from
said plaintiff to said defendants and the said rice was then
and there identified and the title to the said rice then and
there passed from said plaintiff to said defendants; . . . that
it was then and there agreed between said plaintiff and said
defendants, through their said agent, George B. Champlin,
that said plaintiff was to deliver the said rice to said de-
fendants f. o. b. at the railroad and in the cars, at Pro-
berta, in said County of Tehama, at such dates as the
weather conditions would permit; that said plaintiff com-
menced to deliver said rice and proceeded in the delivery
of said rice, all in accordance with said conditions of sale
and purchase, and the said rice was accepted and received
by said defendants and the full amount of said purchase
price was paid therefor." Then follow allegations as to
the assessment of taxes, as heretofore stated, demand upon
the defendants for reimbursement, and refusal on the part
of the defendants to pay to plaintiff the amount of said
taxes.

The court made the following findings: "1. That all of
the allegations of the complaint are true; 2. that before, or
at the time of, the said sale and purchase of said rice, said
plaintiff furnished to said defendants, by and through
their said agent, George B. Champlin, samples of said rice,
and that said defendants had and reserved the right to

sample any or all of said rice at the time of or before the delivery to and acceptance of the same by them, and that they had and reserved the right to reject any of said rice which did not come up to the samples furnished to them as aforesaid.''

It is contended by the appellants that, under the negotiations hereinbefore set forth, all that the defendants agreed to buy was that portion of the rice in the pile belonging to the plaintiff, and then situated in his barn, equal to the sample presented; that while it is true that the particular pile or piles from which the rice equal to the sample is to be taken, is identified, the purchaser buying subject to grading, does not buy unconditionally; that the very fact that the rice is all subject to grading shows that the sale was conditional or executory. It is further argued that until the rice is graded and segregated, it cannot be ascertained what rice, or how much rice, the purchaser may take or will be required to take, under the terms of the contract; that the agreement is not to purchase all the rice, but simply all the rice in the pile that may be found equal to the sample, when the sacks of rice are torn down from the piles and sampled that the seller, under such a contract, retains the title, and, as found by the court in this case, the purchaser retained the right to reject all rice in the various sacks not equal to the sample; that such a sale is entirely different from a case where a group of articles, a stack of hay, or other fixed commodity, is sold at fixed rates, the buyer agreeing to take the whole lot, or whole quantity, without any right of rejection, regardless of quality or quantity, and leaving nothing to be done but to list, weigh or measure the articles for the purpose of arriving at the total price or amount of money to be paid; that, in the case at bar, the identification of the rice sold consists in the grading, i. e., in segregating the good rice from the inferior rice in order to determine the quantity to be taken and paid for by the defendants under the terms of their purchase.

The rule, as stated in *Blackwood* v. *Cutting Packing Co.,* 76 Cal. 212 [9 Am. St. Rep. 199, 18 Pac. 248], ''seems to be well settled that the question as to whether the title has passed is one as to the intention of the parties. And such intention is, as a matter of course, to be gathered from the language of the parties, considered in the light of all the

circumstances of the case. But in the absence of anything showing a contrary intent, there are certain circumstances which have a controlling force.'' In Williston on Sales, volume 1, section 262, 2d ed., as to whether title has passed, the rule is stated: ''The question is essentially one of fact; and though if the whole contract of the parties is reduced to writing this question is determined by the court, as also if the facts are so clear as to justify but one conclusion, yet the inquiry is always one of fact, subject only to the rules of presumption for the ascertainment of intention given in the following section. In a doubtful case the question is appropriate for the jury, evidence being admitted which is calculated to show the intention of both parties as indicated to each other. Not too great stress must be laid upon the use of the words 'sell' or 'buy,' or 'sold' or 'bought,' by the parties. These words are constantly used as meaning or including contract to sell or contract to buy.'' The same author in the same volume, section 269, says further on the subject of inspection: ''Where, however, inspection involves more than such examination as may be necessary to see if the goods are such as are described in the contract, for instance where the buyer may exercise choice or judgment in taking or rejecting part or the whole, it would seem as if there were quite as much reason for presuming the transfer of the property did not take place until after inspection as where weighing or measuring is necessary to fix the price.'' Citing *Gilman* v. *Hill*, 36 N. H. 311; *Outwater* v. *Dodge*, 7 Cow. (N. Y.) 85; *Pike* v. *Vaughn*, 39 Wis. 499.

In *Blackwood* v. *Cutting Packing Co., supra,* the court in commenting upon section 1140 of the Civil Code, on the subject of identification, says: ''This section does not dispense with identification. On the contrary, it requires it. It only dispenses with segregation when the property is otherwise identified. Therefore, where the identification consists in the segregation, weighing, or measuring, they are still necessary.'' That case involved the purchase of apricots to be grown for five succeeding seasons at so much a pound, the apricots to be delivered f. o. b. Haywards, quantity not less than 75 tons and not exceeding 200 tons per annum. It was there held that the title had not passed.

In the case of *Turner, Kuhn & Fraser, Inc.,* v. *Jones,* 61 Cal. App. 732 [215 Pac. 1030], in considering the question as to whether the title had passed to a certain number of bales of cotton, this court, in the first district thereof, says: "In discussing this subject Mr. Benjamin in his work on Sales in substance states that it not infrequently happens that parties fail to express their intentions as to when property, the subject of a sale, shall pass, or that they manifest them so imperfectly as to leave it doubtful what they really mean, if indeed they have any definite intentions, for the reason that the question was not brought up to them. In such cases courts have adopted the construction that when there has been no clear manifestation of intention the presumption of law is that the contract is an actual sale if the specific thing is agreed upon and is ready for immediate delivery; but that the contract is only executory when the goods have not been specified, or if, when specified, something remains to be done to put them in a deliverable shape, or to ascertain the price. In the former case there is no reason for imputing to the parties any intention to suspend the transfer of the property, inasmuch as the thing and the price have been mutually assented to and nothing remains to be done. In the latter case, when something is to be done to the goods it is to be presumed that the parties intended to make the transfer of the property dependent upon the performance of the things yet to be done, as a condition precedent. Of course, these presumptions yield to proof of a contrary intent. (Benjamin on Sales, secs. 308, 312.)"

[1] The intention of the parties is to be gathered from the language and the contract considered in the light of all the circumstances, but, if nothing is said in the contract, whether the contract be oral or written, expressing the intention of the parties, whether the title passed *in praesenti* is to be determined "from all the circumstances," the acts to be performed by the respective parties, if any, and the rules of law applicable thereto.

In Mechem on Sales, volume 1, section 52, where goods are to be measured, weighed or tested to ascertain the kind or quality of goods the buyer is to accept, the rule as to when title passes is thus stated: "There are still other cases, not often clearly distinguished, in which the weigh-

ing, measuring, testing and the like is to be done neither to ascertain the price nor the identity of the goods alone, but also to determine whether the particular goods in question, apparently of the kind agreed upon, are really of the kind and quality which the buyer is bound to accept. Thus, though the parties are contracting with reference to specific chattels, for example a number of bales of cotton, but, by the contract, the cotton is thereafter to be sampled by both parties to ascertain if it conforms to a sample which was the basis of the dealing, the title will not pass until that act is done; and the fact that the cotton is yet to be weighed in order to ascertain the price furnishes simply another reason leading to the same result."

[2] If the goods had been identified, the mere fact that they are to be weighed in order to ascertain the price does not offer any reason for concluding that the title has not passed. The distinction is made when it is necessary to sample the goods to determine their quality and so ascertain and identify the goods as well as the quantity of the goods that the buyer is bound to accept under his contract, in which case it is here held that the title would not pass until the quality of the goods had been ascertained and segregation made thereof between the goods of the quality bargained for and those of an inferior grade. The same author, in section 520 of volume 1, expresses the rule as we have just stated. In the recent case of *Idaho Products Co.* v. *Bales,* 36 Idaho, 800 [214 Pac. 206], the supreme court of Idaho, in passing upon a contract for the sale of hay, the substantive portion of which is as follows: "That the grower has this day sold to the buyer all his strictly No. 1, merchantable alfalfa hay, consisting of approximately 200 tons, now in stack or growing on that certain premises described as Old Conner ranch and of which hay the grower has the sole ownership and control; it being expressly understood and agreed that the grower is to harvest and stack the said hay at the proper time and in the proper manner, and that the said hay is to be delivered to the buyer in stack on the said premises, or to the baler on the said premises, as the buyer may direct." The court, in construing the contract, and to ascertain whether the title had passed, quoted section 501 of Mechem on Sales as follows: "Where, though the specific goods are in a deliver-

able condition, there still remains some act like measuring, weighing or testing in order to determine the price, where the price is to depend upon the quantity or quality of the goods, the title usually will not pass in the absence of evidence of an intention to the contrary until this act is done."

It is added: "It therefore remained within the power of the buyer to refuse to accept the hay as strictly No. 1, merchantable alfalfa hay, in the event the same did not fall within that grade as established by the department of agriculture. By this contract. the buyer contracted for no other grade of hay than was strictly No. 1 merchantable hay.

"If we are correct in the construction given to the terms of the contract, there was no acceptance by the buyer of the hay until it was graded. There being no acceptance of the hay unconditionally, the title to the hay did not pass when the contract was signed, and the same was therefore an executory and not an executed contract for the sale of the hay. Not only is this true, but the hay was not delivered for the reason that the buyer did not direct that the hay should be delivered in the stack or to the bailer, and it is clear to our minds that it was not within the intention of the parties that there should be a delivery."

It will be observed that in this case the hay was to be graded. In the instant case the rice was to be graded. It was held in the Idaho case that the title to the hay did not pass until it was graded. It would seem that the same rule would hold here that the title to the rice would not pass until it was graded. The quantity to be purchased in both cases depended upon the quality. In neither case was the purchase unconditional. In both cases there appears no acceptance until after grading and in both cases the right to reject all goods not of a specified quality appeared in the contract.

In *Cornell* v. *Clark*, 104 N. Y. 451 [10 N. E. 888], a case involving the purchase and sale of railroad ties, where the contract provided for the delivery of the ties monthly, "and the balance to be paid after inspection and classification of the ties, and 'when they were taken and used,' " it was held that the title to the ties did not pass by the delivery but only after inspection and ascertainment of quality.

75 Cal. App.—16

In *McFadden* v. *Henderson*, 128 Ala. 221 [29 South. 640], the supreme court of Alabama had before it a contract for the purchase of 1,500 bales of cotton at a price therein specified, to be all of a certain quality, the offer to purchase being in the following words: "We offer six seven-eighths f. o. b. round, nothing below middling, subject to reweights." The court in ascertaining whether title had passed, held as follows:

"The general rule to determine whether a contract of sale is executed or executory is, 'If anything remains to be done by either party to the transaction before delivery, as for example, to determine the price, quantity or identity of the thing sold, the title does not vest in the purchaser, and the contract is merely executory. If the sale is complete, and the goods perish without the fault of the seller, the purchaser is bound to pay the agreed price.'

"In this case, the number of bales out of the lot of 1,500, that were sold was not determined, for the number that would class low middlings and under, and how many were unmerchantable as being 'sandy, seedy or false packed,' was unascertained and could not have been known until the cotton was turned out and classed, which remained, under the terms of sale, to be done, and which was never done. The sale was, therefore, executory and not executed."

In the case of *Longsdorff* v. *Meyers*, 171 Mo. App. 255 [157 S. W. 85], in construing a contract of sale for apples that were to be graded in order to determine the quantity to be taken and the price to be paid, the court held as follows: "It is the law, as shown by citations in plaintiff's brief, that if a given quantity of personal property which constitutes a part of a larger mass of exactly the same kind and quality (as, for instance, wheat in an elevator), is sold, the title to the quantity sold will pass, though it has not been separated from the mass. *Brownfield* v. *Johnson*, 128 Pa. 254 [6 L. R. A. 48, 18 Atl. 543]; *Nash* v. *Brewster*, 39 Minn. 530 [2 L. R. A. 409, 41 N. W. 105]. And so replevin may be had for one's part of such property. *Kaufman* v. *Schilling*, 58 Mo. 218. But it is said in the first of these cases that if 'the property is sold as part of a mass made up of units of unequal quality or value, . . . selection is essential to an execution of the contract'—that is, the passing of title. The same, in effect, is said in the

other case. If we apply these cases to the facts as stated by plaintiff himself, he fails in his case; for defendants were not to take a part of a larger mass of exactly like kind. They were to select a part of a larger mass of unequal quality, and until selection the title did not pass."

In the case at bar the defendants were not to select a part of a larger mass where the whole mass was of an equal quality, but they were to take that portion thereof which was of a particular quality and reject and set aside and refuse acceptance of all that portion of the mass which was not of a uniform quality, or of a quality below the sample fixing the standard by which the quality of rice was to be determined, and so fix the quantity which the purchaser was bound to accept and pay for.

In *Sempel* v. *Northern Hardwood Lumber Co.*, 142 Iowa, 586 [121 N. W. 23], the supreme court of Iowa, in considering a contract for the sale and purchase of certain logs of certain dimensions and quality, said: "Broadly speaking, the question when the title to personal property sold is to pass depends upon the intention of the parties, and, when there is any dispute as to the terms and material circumstances of the agreement, it is a question for the jury; but, where there is no material conflict in the evidence or the terms of the agreement are admitted, the intent of the parties is ordinarily for the court," and further: "In the absence of a proved intent otherwise, a sale is not complete and title does not pass so long as anything remains to be done between the parties. The article must be designated and its identity ascertained, and, if it be a part of a greater mass, it must be set apart, or, if sold by weight or measure, the quantity must be ascertained by the usual standards." In this case, the quality of the logs was to be determined, their size, etc. The court held that the title had not passed until these acts had been performed, and the judgment of the lower court was therefore reversed. This case cites a number of other cases where the same conclusions are reached.

In the case of *Fiddyment* v. *Johnson*, 18 Cal. App. 339 [123 Pac. 342], the sale was of the baled hay in two barns belonging to the plaintiff at a fixed price per ton. There, nothing was to be done but to weigh the hay, as it was all baled and unconditionally sold. It was properly held

that the title passed. In the case of *Gianelli* v. *Globe Grain & Milling Co.*, 48 Cal. App. 103 [191 Pac. 720], the hay was all baled, piled in one pile, identified, $6,000 was paid on account and the insurance on the hay was transferred from the seller to the buyer. The real controversy in that case was over the meaning of the words "f. o. b," it being claimed by the appellant that the title did not pass until the hay had been delivered f. o. b., cars or at warehouse. This court held that as the property was fully identified the circumstances of the transaction and the agreement evidenced an intent to pass title presently, and that the meaning of the words f. o. b., in that case, simply meant that the seller was to deliver the hay at his costs.

In *Anderson* v. *Crisp*, 5 Wash. 178 [18 L. R. A. 419, 31 Pac. 638], the court had before it an agreement for the sale of bricks in a kiln. The rule is there stated as follows: "Where a vendee had bargained and paid for a quantity of 'merchantable brick,' which brick were to be sorted from a kiln by the vendee, such a sale does not pass the title of the brick to the vendee; it being impossible to determine, before a segregation, not only what particular brick were sold, but what relative portions of the kiln were sold." The court, in its opinion, makes a clear distinction between cases where a part of a mass of property is sold, which is all of one quality, and cases where the property sold and to be accepted depends upon the quality. In referring to the case of *Kimberly* v. *Patchin*, 19 N. Y. 330 [75 Am. Dec. 334], a case having to do with the sale of part of a mass of property of one quality, the Washington court says: "There it was held, upon a sale of a specific quantity of grain, that its separation from a mass indistinguishable in quality or value, in which it is included, is not necessary to pass the title, when the intention to do so is otherwise clearly manifested. In that case it will be noticed that the goods were indistinguishable in quality or value, and it was upon that particular state of facts that the argument of the court was based. 'It is,' said the court, 'a rule asserted in many legal authorities, but which may be quite as fitly called a rule of reason and logic as of law, that in order to be an executed sale, so as to transfer a title from one party to the other, the thing sold must be ascertained. This is a self-evident truth, when applied to those sub-

jects of property which are distinguishable by their physical attributes from all other things, and therefore are capable of exact identification. . . . But it must be admitted that if all the property in the mass is not of equal value something more does remain to be done. Thus, in the case at bar, another element is injected into the contract, and there is a question of relative values to be yet determined. The appellants did not buy a portion of an indistinguishable mass, where all the component parts were of equal value; but their contract called for 162,000 merchantable brick; and the evidence was that the brick that were deemed unmerchantable were thrown aside and not counted in when they came to haul them. So that it is impossible to determine, before the segregation of the brick, not only what particular brick were sold, but what relative portions of the kiln were sold.'' The holding of the Washington court was that until the brick had been segregated to determine their merchantable quality, title did not pass.

In the case of *McLaughlin* v. *Piatti,* 27 Cal. 452, the agreement of sale related to 500 head of cattle out of a herd containing many more, the court said: ''It is a fundamental principle pervading everywhere the doctrine of the sales of chattels, that if goods be sold (while mingled with others) by number, weight, or measure, the sale is incomplete, and the title continues with the seller until the bargained property is separated and identified. . . . In the case under consideration, it could not be said with certainty that any particular five hundred head of cattle belonged to Baker or the plaintiff as his assignee, until a severance of that number from the herd from which they were to be taken.''

In the case of *Wong Foo* v. *Southern Pacific Co.,* 41 Cal. App. 42 [181 Pac. 823], the agreement read:

''Hop Sing hereby sells to Rourke Company . . . 810 fancy spuds at $1.30 per sack . . . being that certain lot in ground at Donlon Island . . . to be delivered f. o. b. bank and shipped to Stockton on or before Monday, next week, 1915, unless otherwise directed by Rourke Co. Must be new sacks, full, open-mouthed, contents properly graded and sorted and . . . to average 116 lbs to sack.''

''In consideration I hereby acknowledge receipt of . . . one dollar in part payment of the above sale; balance to be

paid after receipt of goods in good merchantable condition as above mentioned. It is understood that arrival of goods at Stockton in good condition, as provided above, shall be considered as the time and place for the consummation of this sale.''

It was there said: ''These provisions of the agreement were for the purpose of permitting the Rourke Company either to elect to purchase the potatoes if they came up to the required standards, or to reject the same if they failed to measure up thereto. The agreement, therefore, amounted to no more than an executory contract of sale, the title to the property remaining in the vendor.''

[3] The court in this case in its findings found that the allegations of the complaint were true, which included the allegation that the rice was identified and that title to said rice passed from the plaintiff to the defendants at the time of the negotiations, to wit, February 15, 1922, but the court also found that the defendants had the right to reject all the rice not equal to the sample, and that the rice was to be graded, which finding brings the case within the rule set forth in the authorities hereinbefore cited that when it is necessary to grade the property in order to determine what portion thereof passed under the contract and must be accepted by the buyer, that title thereto remains in the seller until the segregation and grading has taken place. As we have said, the testimony in this case is silent upon the question of when the title passed and therefore that question must be determined in the light of the authorities setting forth the rule to be applied and followed in such cases. We do not think it necessary to a determination of this case to discuss that portion of the contract which provides that the rice was to be delivered f. o. b. cars at Proberta station. The fact that the rice to be taken was unsegregated and its quality had to be determined to fix the amount to which the price agreed to be paid should attach and the quantity to be accepted remained undetermined is decisive herein.

The judgment of the trial court is reversed.

Hart, J., and Finch, P. J., concurred.